UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JENNIFER S. KEACH, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 17-cv-10133-ADB |
| | * | |
| NANCY A. BERRYHILL, | * | |
| *Commissioner of Social Security*, | * | |
| | * | |
| Defendant. | * | |

## MEMORANDUM AND ORDER

BURROUGHS, D.J.

Plaintiff Jennifer S. Keach ("Ms. Keach" or "Claimant") brings this action pursuant to

section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), challenging the final decision of

the Commissioner of the Social Security Administration (the "Commissioner") denying her

claim for Social Security Disability Insurance ("SSDI") benefits. Currently pending are

Claimant's motion to reverse the Commissioner's decision denying her disability benefits [ECF

No. 21], and the Commissioner's cross-motion for an order affirming the decision. [ECF No.

27]. For the reasons described herein, the Court finds that the Administrative Law Judge's

decision was supported by substantial evidence and therefore <u>DENIES</u> Claimant's motion to

reverse and remand and <u>ALLOWS</u> the Commissioner's motion to affirm.

## I.    BACKGROUND

### A.    Statutory and Regulatory Framework: Five-Step Process to Evaluate Disability Claims

"The Social Security Administration is the federal agency charged with administering

both the Social Security disability benefits program, which provides disability insurance for

covered workers, and the Supplemental Security Income program, which provides assistance for

the indigent aged and disabled." <u>Seavey v. Barnhart</u>, 276 F.3d 1, 5 (1st Cir. 2001) (citing 42

U.S.C. §§ 423, 1381a).

The Social Security Act (the "Act") provides that an individual shall be considered to be

"disabled" if he or she is:

> unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months.

42 U.S.C. § 1382c(a)(3)(A); <u>see also</u> 42 U.S.C. § 423(d)(1)(A). The disability must be severe,

such that the claimant is unable to do his or her previous work or any other substantial gainful

activity that exists in the national economy. <u>See</u> 42 U.S.C. § 1382c(a)(3)(B); 20 C.F.R. §

416.905.

When evaluating a disability claim under the Act, the Commissioner uses a five-step

process, which the First Circuit has explained as follows:

> All five steps are not applied to every applicant, as the determination may be concluded at any step along the process. The steps are: 1) if the applicant is engaged in substantial gainful work activity, the application is denied; 2) if the applicant does not have, or has not had within the relevant time period, a severe impairment or combination of impairments, the application is denied; 3) if the impairment meets the conditions for one of the "listed" impairments in the Social Security regulations, then the application is granted; 4) if the applicant's "residual functional capacity" is such that he or she can still perform past relevant work, then the application is denied; 5) if the applicant, given his or her residual functional capacity, education, work experience, and age, is unable to do any other work, the application is granted.

<u>Seavey</u>, 276 F.3d at 5 (citing 20 C.F.R. § 416.920).

### B. Procedural Background

Ms. Keach filed her application for SSDI benefits on September 26, 2013. [R. 28].[1] She

---

[1] References to pages in the Administrative Record, which were filed electronically at ECF No. 14, are cited as "[R. ___ ]."

alleged that she became disabled on September 26, 2013 due to narcolepsy.[2] [R. 30, 43–45]. Her date last insured was December 31, 2017. [R. 30].

The Social Security Administration (the "SSA") denied Ms. Keach's application for SSDI benefits on November 14, 2013 [R. 94–96], and again upon reconsideration on March 20, 2014. [R. 98–100]. Thereafter, Ms. Keach requested an administrative hearing [R. 104–05], which took place before Administrative Law Judge ("ALJ") Paul S. Carter on March 31, 2015. [R. 249]. Ms. Keach, who was represented by counsel, appeared and testified at the hearing. Id. On June 10, 2015, the ALJ issued a decision finding that Ms. Keach was not disabled. [R. 25, 32]. The SSA Appeals Council denied Ms. Keach's Request for Review on January 11, 2017. [R. 1–3, ECF No. 1 at 2]. On January 26, 2017, Ms. Keach filed a timely complaint with this Court, seeking review of the Commissioner's decision pursuant to section 205(g) of the Act. [ECF No. 1].

### C.    Factual Background

Ms. Keach was born in September 1973 and resides at 42 Tremont Avenue in Taunton, Massachusetts with her boyfriend and two children. [R. 47–48]. She graduated from high school and studied criminal law at Massasoit Community College for two years, but did not obtain a degree. [R. 49]. She then completed schooling for massage therapy and obtained a certification, which expired approximately five years ago. [R. 50]. She testified that she receives support from her boyfriend and $500 in food stamps. [R. 52].

---

[2] The SSA's Program Operations Manual System ("POMS") defines "narcolepsy" as "a chronic neurological disorder characterized by recurrent periods of an irresistible urge to sleep accompanied by three accessory events: [cataplexy, hypnagogic hallucinations, and sleep paralysis]." Soc. Sec. Admin., Evaluation of Narcolepsy, POMS DI 24590.005, *available at* https://secure.ssa.gov/poms.nsf/lnx/0424580005.

**D.    Medical Evidence[3]**

On February 26, 2013, neurologist Syed T. Ali, M.D. examined Ms. Keach and diagnosed her with narcolepsy without cataplexy.[4] [R. 290]. Her physical, neurological, and mental examinations were all normal. Dr. Ali ordered a sleep study and an MRI of the brain. [R. 288–92]. On March 16, 2013, Hirschel D. McGinnis, M.D., conducted a brain MRI which showed normal appearance and no abnormal findings. [R. 291–92]. On March 19, 2013, Ms. Keach had a sleep consultation at Bristol Pulmonary and Sleep Medicine. [R. 314–15]. Certified physician's assistant ("PA-C") Beth Mastria conducted the consult and documented Ms. Keach's complaints. Id. She recorded that Ms. Keach complained of postnasal drip, sinus congestion, chest pain/pressure, gastroesophageal reflux, nausea, dysuria, arthralgia, and vision change. [R. 314]. The physical examination was normal and PA-C Mastria recommended an additional sleep study, diet, exercise, and weight reduction. [R. 315].

Ms. Keach had a follow-up appointment with Dr. Ali on March 26, 2013. [R. 293–97]. He conducted a physical examination, which was normal, and Ms. Keach denied having any pain, anxiety, or other symptoms. [R. 293–96]. He noted new problems with caffeine excess, narcolepsy without cataplexy, and recorded an improvement in her chronic tension type headache. Id.

On May 27, 2013, George Chilazi, M.D. examined Ms. Keach and noted she was doing "tremendously well, without any complaint," and the physical exam conducted that day was

---

[3] Because Claimant's Memorandum in Support of her Motion for Order Reversing the Commissioner's Decision only challenges the ALJ's findings with respect to her narcolepsy, the Court discusses only the evidence related to this impairment.

[4] The SSA POMS defines "cataplexy" as "attacks of loss of muscle tone, sometimes with actual collapse, during which the individual always remains conscious." Soc. Sec. Admin., Evaluation of Narcolepsy, POMS DI 24590.005, *available at* https://secure.ssa.gov/poms.nsf/lnx/0424580005.

"completely unremarkable." [R. 487–89]. On May 29, 2013, Jennifer F. Miley, NP, examined Ms. Keach and documented her complaints of fatigue, chest pains, and frequent headaches, although the physical exam was normal. [R. 298–302]. NP Miley recorded problems associated with chronic tension type headache and narcolepsy without cataplexy. [R. 301]. She noted Ms. Keach's scheduled sleep consultation for July, and indicated she should not drive when feeling tired. Id.

On June 7, 2013, PA-C Mastria examined Ms. Keach after she presented with daytime hypersomnolence.[5] [R. 316]. Ms. Keach reiterated complaints of postnasal drip, sinus congestion, cough, diarrhea, gastroesophageal reflux, dysuria, and dizziness, but the physical exam was overall normal. [R. 316–17]. On July 31, 2013, Ms. Keach underwent a sleep study evaluation which was recorded by PA-C Mastria. [R. 480]. PA-C Mastria wrote that "[t]his is a patient with significant snoring, but no obstructive sleep apnea. However, the frequency of her arousals do not completely explain her significant excessive daytime sleepiness." [R. 481]. Treating physician Imad J. Bahhady, M.D. also conducted a sleep study on August 16, 2013 and stated that Ms. Keach had severe hypersomnia, "suggesting the possibility of narcolepsy," and recommended increased sleep time, improvement in sleep hygiene, and a follow-up appointment. [R. 482].

On August 19, 2013, NP Miley examined Ms. Keach a second time. [R. 303–06]. Ms. Keach complained of fatigue and sleep disorder, although the physical examination was normal.

---

[5] Dorland's Illustrated Medical Dictionary, 896 (32d ed. 2012) defines hypersomnolence, or hypersomnia, as "excessive sleeping or sleepiness, as in any group of sleep disorders with a variety of physical and psychogenic causes." Hypersomnolence is also defined as a "sleep disorder of central nervous system origin characterized by prolonged nocturnal sleep and periods of daytime drowsiness." Reference.MD, Hypersomnolence, Idiopathic, http://www.reference.md/files/D020/mD020177.html (last visited Mar. 21, 2018).

[R. 304–05]. NP Miley wrote that Ms. Keach's chronic tension type headache had been well-controlled with B complex, although her fatigue due to narcolepsy continued. [R. 306]. On August 22, 2013, PA-C Mastria examined Ms. Keach and noted largely the same diagnosis and complaints as were present at the June visit. [R. 318–19]. PA-C Mastria recommended Nuvigil for Ms. Keach's narcolepsy, taking scheduled naps daily, keeping a regular sleep schedule, and avoiding driving long distances. [R. 319].

On September 24, 2013, Ms. Keach visited Dr. Bahhady. [R. 322–23]. She presented with fatigue, but Dr. Bahhady wrote that she was doing better with Nuvigil. [R. 322, 464]. He also noted possible cataplexy "during sig emotions," but none recently. [R. 322]. The physical examination was normal, and he recommended continued use of the medication. [R. 323]. He also indicated that Ms. Keach could take one nap in the "pm" and instructed her to keep a regular schedule. Id.

On November 11, 2013, state-agency physician Phyllis Sandell, M.D. reviewed Ms. Keach's medical records and completed a disability determination explanation. [R. 73–81]. Although Dr. Sandell indicated that Ms. Keach had narcolepsy, she opined that she did not have any exertional limitations, postural limitations, visual limitations, communicative limitations, or environmental limitations other than that she should avoid heights and hazardous equipment and drive with caution. [R. 77–78]. She concluded that Ms. Keach retained the residual functional capacity ("RFC")[6] to perform her past relevant work as a collection clerk, massage therapist, rural carrier associate, and child caretaker, and was therefore not disabled. [R. 79–80].

---

[6] The Social Security Administration defines "Residual Functional Capacity" as an individual's "impairment(s), and any related symptoms, such as pain, [which] may cause physical and mental limitations that affect what [he or she] can do in a work setting." 20 C.F.R. § 404.1545(a)(1). The SSA defines RFC to be "the most you can still do despite your limitations." Id.

On March 5, 2014, state-agency physician Herbert Kushner, M.D., also reviewed Ms. Keach's medical records and completed a disability determination explanation. [R. 82–92]. He indicated that she suffered from narcolepsy which causes daytime sleepiness, but that her neurological exam was normal. [R. 87]. He detailed the credibility of her allegations and indicated that she described no discrete physical limitations except for the need to nap, which can be remedied by adjustments in medication. Id. Dr. Kushner completed a physical RFC assessment and opined that Ms. Keach had no exertional limitations, manipulative limitations, visual limitations, communicative limitations, or environmental limitations, except that she should avoid heights and hazardous equipment and should not drive. [R. 88–90]. He recorded her postural limitations caused by cataplexy as follows: she can never climb ladders, ropes, or scaffolds; she can frequently balance; and she is not limited in her ability to climb ramps or stairs, stoop, kneel, crouch or crawl. [R. 89]. He determined that she retained the RFC to perform her past relevant work as actually performed and was therefore not disabled. [R. 91].

Ms. Keach visited PA-C Mastria on March 31, 2014 for a narcolepsy follow-up. [R. 320–21]. The physical examination was overall normal despite Ms. Keach's complaints of night sweats and nausea. Id. PA-C Mastria increased Ms. Keach's daily prescription dosage of Nuvigil, and recommended continued daily scheduled naps, and avoiding drowsy driving. [R. 321]. On April 14, 2014, Ms. Keach went to Dima Quraini, M.D., a cardiologist, for a routine follow-up. [R. 345–46]. Dr. Quraini wrote that Ms. Keach was "doing well and ha[d] no new complaints." [R. 345]. She noted that Ms. Keach spends her days taking care of her two children. Id. Ms. Keach did not report any pain or issues to Dr. Quraini at that time and the physical examination was normal. Id.

On May 20, 2014, PA-C Mastria examined Ms. Keach and documented her active diagnoses of hypersomnia and narcolepsy. [R. 337–39]. PA-C Mastria described Ms. Keach's daytime hypersomnolence as improving because the frequency of the episodes had decreased. [R. 338]. She noted that Ms. Keach was "feeling much better" with medication, Nuvigil, although she was still taking a scheduled nap if time permitted. Id. PA-C Mastria wrote that Ms. Keach denied cataplexy, drowsy driving, frequent arousals, headache, poor concentration, or weight gain. Id.

On August 27, 2014, Ms. Keach visited Dr. Douglas-Steele for a follow-up. [R. 439]. She denied experiencing, inter alia, fatigue, abdominal pain, and chest pain, and the physical exam findings were normal except that she was overweight. [R. 440–41].

On November 3, 2014, Ms. Keach visited PA-C Mastria who noted that her narcoleptic symptoms did not interfere with her daily activities, and there was no drowsy driving or cataplexy. [R. 478]. PA-C Mastria noted continued use of Provigil,[7] although she wrote that "we may consider increasing the dose." [R. 479]. On January 1, 2015, Ms. Keach again visited Dr. Douglas-Steele for "evaluation and management of chronic issues" including, among others, hypertension, high cholesterol, vascular complications including clots in her ovarian veins, incisional hernia, and chest pain. [R. 398]. Dr. Douglas-Steele listed her current active health conditions which did not include narcolepsy, although he indicated she was still taking Provigil. [R. 380]. On January 5, 2015, Jonathan R. Ellis, M.D. performed a diagnostic report of Ms. Keach. [R. 388]. He found that her functional capacity was normal and she had no chest pain. Id. Dr. Douglas-Steele also reported on January 5, 2015 that Ms. Keach denied, inter alia, fatigue,

---

[7] At this point her medication for narcolepsy is listed as "Provigil" rather than "Nuvigil," but these appear to be substantially similar medications for treating symptoms of narcolepsy.

anxiety, depression, headache, weakness, abdominal pain, and chest pain. [R. 399–401]. He also noted her general appearance as well-developed, well-nourished, well-groomed, with no acute distress or deformities, although she was overweight. [R. 400].

On March 18, 2015, Ms. Keach visited PA-C Mastria for complaints related to sleep problems. [R. 477–78]. Ms. Keach reported that she was experiencing excessive sleepiness during the day that had become progressively worse over the last three weeks, but that her sleep problems did not interfere with daily activities and she had no drowsiness while driving. Id. She was continuing to take Provigil. Id. The physical exam revealed normal strength and functioning in all extremities, normal gait, and normal mood/affect. [R. 479].

### E.    Administrative Hearing

#### 1.    Claimant's Testimony

Ms. Keach testified at the hearing before the ALJ on March 31, 2015. [R. 39–40]. She described her daily routine and activities and reported that, although she has a driver's license and vehicle, she had been told by doctors not to drive more than thirty minutes.[8] [R. 48–49]. She testified that she usually goes to bed between 10:00 PM and 11:30 PM and wakes up by 7:00 AM. [R. 54]. Neither of her children attend school, so they are home with her all day. Id. She testified that she spends about an hour or two "lying down" in a typical day, sometimes around 11:00 AM and other times around 3:00 PM. [R. 55]. When she lies down, she calls her mother to come over and watch her children. Id. In a typical week, her mother comes over five to six days. Id. She stated that there are days, although they are "very few," about one or two days per month, when she does not need a nap during the day. [R. 57]. Ms. Keach is responsible for shopping, laundry, cooking, and all the other housework in a typical day. [R. 56–57]. She indicated she

---

[8] No doctor has issued a letter legally restricting her ability to drive. [R. 48–49].

enjoys gardening and going on walks with her children. Id. She testified that she has no problems walking, standing, and sitting, or with the use of her hands, and can lift and carry up to 50 or 60 pounds. [R. 56–57].

Ms. Keach testified that she last worked in 2013 in a daycare she ran out of her house caring for five children, including her own, but that she had to stop because she was exhausted all the time and required a nap in the afternoon. [R. 50–52]. She stated that her doctors believed her exhaustion was due to her narcolepsy. [R. 52–53]. Before the daycare, she worked as a rural letter carrier for three years. [R. 51]. She was unable to continue with that job after she had her son and her hours of availability and driving were less flexible. Id. Before that she worked as a massage therapist and a bill collector. Id.

Ms. Keach's primary care physician is Dr. Douglas-Steele, who, after determining her exhaustion was not thyroid-related, sent her to Bristol Pulmonary to see a sleep specialist. [R. 53]. She stated that her doctors had her change her schedule to try to get more sleep at night to see if it helped. [R. 57–58].

Ms. Keach testified that she is now taking Provigil for narcolepsy, 200 milligrams in the morning and 200 milligrams in the afternoon. [R. 58–59]. She stated that when the medication is not working, she is more tired all day and has about a five-minute warning before she needs to find a place to stop and nap. [R. 60]. She testified there were a couple of occasions where she had a cataplectic episode, in which she lost control of her body, although she remained conscious. Id. These episodes occurred two or three times in one month. [R. 60–61]. She stated that she had an upcoming doctor's appointment to review her narcolepsy medication. [R. 61].

Ms. Keach's mother, Sandra Keach, also testified at the hearing outside the presence of her daughter. [R. 66]. She testified that she is retired and sees her daughter almost every day, or

at least three times a week. [R. 66–67]. She explained that when her daughter calls, it means she must stop what she is doing and take a nap, so Sandra Keach goes to her house within five to ten minutes of such a call. [R. 67–68]. Sandra Keach testified that she stays at her daughter's house anywhere from thirty minutes to two hours. [R. 69]. She explained that it makes her nervous that her daughter drives with the children, although she does not do it for extended periods of time. Id. Finally, she testified that she does not remember when her daughter's sleep problems started, but that she has been helping her out for the past three or four years. [R. 68–69].

2. Vocational Expert Testimony

Independent vocational expert ("VE") Robert Lasky, Ph.D. also testified at the hearing before the ALJ on March 31, 2015. [R. 61]. Dr. Lasky analyzed Ms. Keach's past relevant work and classified it as follows: childcare worker, DOT # 241.357-010, a semi-skilled, medium level job; massage therapist, DOT # 334.374-010, a semi-skilled, medium level job; rural mail carrier, DOT # 906.683-022, a semi-skilled, medium level job; and collection clerk, DOT # 216.362-014, a skilled, sedentary level job. [R. 62–63]. The ALJ inquired how many absences any of the listed jobs would allow before work would be compromised. [R. 63]. The VE testified there is a spectrum depending on the employer and industry, but "[o]n a conservative side, typically five unexcused absences per year, a calendar year, would preclude employability. On the liberal side, even one sustained absence per month would potentially compromise employability significantly." [R. 63]. He then testified that it is in his view that if a person were to miss more than one day per month, it would compromise his or her ability to maintain employment in a skilled or semi-skilled position. Id.

The ALJ then inquired about breaks during a normal workday. The VE testified that a daycare worker must be focused and attentive throughout the time the children are in his or her

custody, with less ability for a pattern of breaks during the day. [R. 64]. The VE also testified that, as to the other jobs discussed, there is typically a fifteen minute break after two hours of work, one in the morning, one in the afternoon, and lunch can be up to an hour. Id. The ALJ then inquired about an employer's expectation for an employee's ability to remain on task. [R. 64–65]. The VE testified that a person should be on task 80-90% of the time if they are to carry out the responsibilities of a typical skilled or semi-skilled job. [R. 65]. If a person is off task more than 20% of the time it would likely compromise employability significantly. Id. The VE testified that it would not be tolerated by an employer if a person needed more than the given breaks during the course of the day, or was off task 20% or more of the time. Id.

## II.    THE ALJ'S DECISION

On June 10, 2015, the ALJ issued a decision finding that Ms. Keach was not disabled under sections 216(i) and 223(d) of the Act during the relevant time period. [R. 28–34]. At the outset, the ALJ determined that Ms. Keach met the insured status requirements of the Act through December 31, 2017. [R. 30]. He then made the following findings of fact and conclusions of law under the five-step process. First, he determined that Ms. Keach had not engaged in substantial gainful activity since September 26, 2013, the alleged onset date. Id. At step two, he found Ms. Keach had the severe impairment of narcolepsy. Id. At step three, the ALJ determined that Ms. Keach did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Id.

The ALJ then considered the entire record and found that Ms. Keach had the RFC to perform medium level work. [R. 31–33]. He considered all of Ms. Keach's symptoms to the extent they were consistent with the objective medical evidence. Id. He then proceeded in two

steps. He first determined Ms. Keach had an underlying medically determinable physical impairment that could reasonably be expected to cause some of her alleged symptoms. [R. 31]. Next, he evaluated the intensity, persistence, and limiting effects of her symptoms to determine the extent to which the physical impairment limited her functioning. Id. He considered Ms. Keach's testimony at the hearing, as well as the entirety of the evidence, in making a finding on the credibility of her statements. Id. He found that her statements regarding the intensity, persistence and limiting effects of her symptoms were not entirely credible. Id. In explaining his reasoning for this determination, the ALJ analyzed the medical evidence of record, summarized above. [R. 32]. He gave great weight to treating physician Dr. Bahhady's opinion that Ms. Keach's cataplexy/narcolepsy was better with medication. Id. He also gave great weight to PA-C Mastria's opinion that Ms. Keach's daytime hypersomnolence was improving with medication and naps, if time permitted. Id. The ALJ also afforded great weight to treating physician Dr. Quraini's opinion that Ms. Keach was doing well, with no new complaints. [R. 33]. Finally, he gave great weight to state-agency medical consultant Dr. Kushner's opinion that Ms. Keach was capable of performing medium level work. Id. The ALJ found Dr. Kushner's RFC assessment that Ms. Keach could perform medium work to be well-supported by the greater weight of the evidence, and therefore determined that Ms. Keach was capable of performing her past relevant work as a collection clerk, given that collection clerk is a sedentary level job. Id. His ultimate conclusion was that Ms. Keach was not disabled, as defined in the Act, from the alleged onset date through the date of his decision. Id.

## III.    STANDARD OF REVIEW

This Court has jurisdiction pursuant to section 205(g) of the Act, 42 U.S.C. § 405(g). Section 205(g) provides that an individual may obtain judicial review of a final decision of the

Commissioner of Social Security by instituting a civil action in federal district court. See 42 U.S.C. § 405(g). The district court may take a number of actions with respect to the Commissioner's decision. First, under sentence four of section 205(g), the court has the power "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." Id. A court's decision under sentence four, however, can be based only on a review of the administrative record of proceedings before the Commissioner. See Whitzell v. Astrue, 792 F. Supp. 2d 143, 147 (D. Mass. 2011) (quoting 42 U.S.C. § 405(g)). If a claimant presents new evidence to the court that was not contained within the administrative record, the court may not consider it. "If additional evidence is to be considered, it must be by way of remand[]" pursuant to sentence six of Section 205(g). Hamilton v. Sec'y of Health & Human Servs., 961 F.2d 1495, 1503 (10th Cir. 1992). Sentence six permits the court to remand a case to the Commissioner for further proceedings and order the evidence to be added to the record for consideration. See 42 U.S.C. § 405(g) ("The court may…at any time order additional evidence to be taken before the Commissioner…but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . . .").

Under section 205(g), sentence four, this Court's review of the Commissioner's decision is "limited to determining whether the ALJ used the proper legal standards and found facts upon the proper quantum of evidence." Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000). In conducting such review, the Court must defer to the Commissioner's factual findings, so long as such findings are "supported by substantial evidence," but the court's review of the Commissioner's conclusions of law is de novo. Id.; see also Nguyen v. Chater, 172 F.3d 31, 35

(1st Cir. 1999) ("The ALJ's findings of fact are conclusive when supported by substantial evidence . . . but are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts."). Substantial evidence means "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229, (1938)). The Court "must affirm the [Commissioner's] resolution, *even if the record arguably could justify a different conclusion*, so long as it is supported by substantial evidence." Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987) (emphasis added) (citing Lizotte v. Sec'y of Health and Human Servs., 654 F.2d 127, 128 (1st Cir. 1981)).

## IV.     DISCUSSION

Claimant advances a series of reasons why the ALJ's decision should be reversed. She challenges the ALJ's determination that she could perform medium work on the grounds that the ALJ failed to make specific findings as to the relevant evidence used to discredit her, erred in assigning weight to various medical opinions, and failed to provide substantial evidence supporting his determination that she did not suffer particular symptoms of narcolepsy. Upon review of the evidence, the ALJ's assessment that Claimant can perform a full range of medium work is supported by substantial evidence in the record. Thus, as explained below, the Court rejects Claimant's arguments as unsupported by the record, and affirms the ALJ's decision.

### A.     Adverse Credibility Determination

Claimant argues there were no grounds to ignore the limiting effects of her narcoleptic symptoms based on a credibility finding, and that the reasons for discrediting her testimony were irrelevant.

The reason for a credibility finding must be grounded in the evidence and articulated in the ALJ's decision. See 20 C.F.R. § 404.1529(c)(3); SSR 96-7p, 1996 WL 374186 (July 2, 1996); see also SSR 16-3P, 2017 WL 5180304 (Oct. 25, 2017). In general, "[t]he credibility determination by the ALJ, who observed the claimant, evaluated [his or her] demeanor, and considered how that testimony fit in with the rest of the evidence, is entitled to deference, especially when supported by specific findings." Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987). The ALJ's determination must contain specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific and clear to any subsequent reviewer. See 20 C.F.R. § 404.1529(c)(3); see also Wells v. Barnhart, 267 F. Supp. 2d 138, 145 (D. Mass. 2003) ("A finding that a claimant is not credible 'must be supported by substantial evidence and the [ALJ] must make specific findings as to the relevant evidence he considered in determining to disbelieve the claimant.'" (quoting Da Rosa v. Sec'y of Health & Human Servs., 803 F.2d 24, 26 (1st Cir. 1986)). When "subjective complaints concerning [a claimant's] condition on or before [the date last insured] are not consistent with the objective medical findings of record," an ALJ is entitled to base his or her determination on other evidence in the record. Evangelista v. Sec'y of Health & Human Servs., 826 F.2d 136, 141 (1st Cir. 1987); see also Makuch v. Halter, 170 F. Supp. 2d 117, 126 (D. Mass. 2001) ("The ALJ, in resolving conflicts of evidence, may determine that the claimant's subjective complaints concerning his [or her] condition 'are not consistent with objective medical findings of record,' if the ALJ's determination is supported by evidence in the record." (quoting Evangelista, 826 F.2d at 141)).

An ALJ must consider certain factors in making a determination concerning a claimant's subjective complaints about pain or other symptoms. Avery v. Sec'y of Health & Human Servs.,

797 F.2d 19, 29 (1st Cir. 2001). The relevant factors, known as the <u>Avery</u> factors, include:

> (1) The nature, location, onset, duration, frequency, radiation, and intensity of any [symptoms]; (2) Precipitating and aggravating factors (e.g., movement, activity, environmental conditions); (3) Type, dosage, effectiveness, and adverse side-effects of any . . . medication; (4) Treatment, other than medication, for relief of [symptoms]; (5) Functional restrictions; and (6) The claimant's daily activities.

<u>Id.</u> The ALJ, however, is not required to "expressly discuss every enumerated factor," <u>Balaguer v. Astrue</u>, 880 F. Supp. 2d 258, 268 (D. Mass. 2012), nor is the ALJ required to provide "an explicit written analysis of each factor." <u>Hart v. Colvin</u>, No. 16−10690, 2017 WL 3594258, at *11 (D. Mass. Aug. 21, 2017) (citing <u>Vega v. Astrue</u>, No. 11−10406, 2012 WL 5989712, at *8 (D. Mass. Mar. 30, 2012)). "[A]s long as an ALJ's credibility determination is supported by substantial evidence, that decision is entitled to deference." <u>Jones v. Colvin</u>, No. 14−12211, 2016 WL 1270233, at *8 (D. Mass. Mar. 31, 2016) (citing <u>Frustaglia</u>, 829 F.2d at 195).

Here, the ALJ made specific findings regarding Claimant's credibility that show he comprehensively considered the <u>Avery</u> factors in assessing her credibility. He first found her statements "concerning the intensity, persistence and limiting effects of her symptoms [to be] not entirely credible." [R. 31]. He later explained that he found her "less than fully credible" because it was "clear that [she] felt better with her medication, [Nuvigil]." [R. 33]. He also found that she could nap in the evening and keep a regular schedule. <u>Id.</u> Claimant denied cataplexy, drowsy driving, frequent arousals, headache, poor concentration, and weight gain on multiple occasions and reported to doctors she was doing well and that her daytime sleepiness did not interfere with her daily activities, including taking care of her two children and going for daily walks.[9] <u>Id.</u>

---

[9] "While a claimant's performance of household chores or the like ought not be equated to an ability to participate effectively in the workforce, evidence of daily activities can be used to support a negative credibility finding." <u>Teixeira v. Astrue</u>, 755 F. Supp. 2d 340, 347 (D. Mass. 2010); <u>see also</u> <u>Duffy v. Colvin</u>, 268 F. Supp. 3d 282, 291 (D. Mass. 2017) (claimant's ability to walk to the grocery store, prepare meals while standing, stand while cooking, use public

Thus, the ALJ's decision to discredit her statements was based on inconsistencies between her reports of symptoms and limitations and the objective medical evidence, and the conflicts between her asserted limitations and her daily activities.

The court in Johnson v. Astrue, No. 09–0119, 2010 WL 455172 (W.D. Okla. Feb. 2, 2010) considered a similar argument. There, the claimant argued the ALJ did not provide an adequate explanation for rejecting as not credible his assertion that his narcolepsy caused him to fall asleep without warning. Id. at *4. The claimant sought treatment and was diagnosed with a "narcolepsy-like" impairment and prescribed medication, but the ALJ found that his allegation of a disabling impairment was not credible because his treating sleep disorder specialist had not placed any limitations on his ability to work. Id. at *5. The court affirmed that he could not perform past relevant work but that he could perform other jobs in the national economy. Id. at *3. The court found the ALJ's determination was supported by substantial evidence as it was consistent with the medical record, and claimant admitted the medication helped him during the day, and had not sought further treatment for narcolepsy. Id. at *5. Similarly, here, the fact that there are no medical opinions placing limitations on Claimant's ability to work, combined with Claimant's own statements concerning her daily activities, supports the ALJ's finding.[10]

_____

transportation, clean, and visit grandson once a week supported a finding that he was capable of a range of light work and thus supported the ALJ's negative credibility finding). Claimant argues there was no evidence as to the duration of her daily walks and gardening activities which made them irrelevant as factors in considering the limiting effects of narcolepsy. The Court does not agree that the lack of information concerning the duration of these activities makes the information entirely irrelevant. Claimant's argument speaks to the weight assigned to the evidence, not its relevance, and the ALJ was entitled to assign this evidence some weight.

[10] Claimant included a block quote from Santana v. Colvin, 15–cv–13232, 2016 WL 7428223 (D. Mass. Dec. 23, 2016), but did not explain how that case supports her argument. Santana held that the fact the claimant could engage in some life activities, like attending church, was not sufficient to contradict the medical evidence indicating she was disabled. Here, as discussed, the ALJ did not use Claimant's daily activities to discount the medical opinions, but rather, he used

Therefore, the ALJ's conclusion that Claimant's ability to work is not limited by her narcolepsy because it is effectively controllable by medication is supported by substantial evidence.

**B.    Weight Given to Medical Opinions**

Claimant argues the ALJ improperly weighed certain medical opinions. In particular, she takes issue with the weight the ALJ gave the opinions of treating physician Dr. Bahhady, cardiologist Dr. Quraini, and the state-agency medical consultant Dr. Kushner.[11]

"Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [his or her] symptoms, diagnosis and prognosis, what [he or she] can still do despite impairment(s), and [his or her] physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2). In determining disability, the ALJ considers medical opinions together with the rest of the relevant evidence. Id. at § 404.1527(b). The weight given to a particular medical opinion is determined by various factors, such as the examining relationship, the nature and length of the relationship, the support provided for the opinion, consistency, and specialization. Id. at § 404.1527(c).

Claimant argues the ALJ erred in weighing Dr. Bahhady's medical opinion. Dr. Bahhady diagnosed Claimant with cataplexy/narcolepsy but found she was doing better with medication. He also opined that she could take naps in the evenings and that her fatigue could be alleviated by rest, but Claimant argues the ALJ did not consider how this could be achieved throughout the day. The Court finds this argument unpersuasive, because Dr. Bahhady suggested that she take

_____

evidence of her daily activities to discredit her own subjective reports of her limitations. Thus, Santana is inapposite.

[11] The ALJ also gave great weight to PA-C Mastria's opinion, which indicated that Claimant's daytime hypersomnolence was improving with an increase in medication dosage, and taking a nap, if time permitted. [R. 32]. Claimant does not challenge the ALJ's reliance on this opinion.

naps in the evenings and keep a regular schedule. Dr. Bahhady did not indicate that she was required to nap during the day. Claimant further contends that the ALJ misstated the evidence because Dr. Bahhady, in instructing her to take a nap in the evening, did not exclude also taking a nap in the morning. There is no reason to believe, however, that Dr. Bahhady meant that she should take two naps, both in the morning and the evening, as well as keeping a regular nighttime sleep schedule. At no point did Dr. Bahhady or his assistant, PA-C Mastria, instruct Claimant to take multiple daily naps. On the contrary, both of their notes support the finding that the medication was helping to alleviate her symptoms, and as she improved, she required fewer naps. Furthermore, it was particularly appropriate for the ALJ to assign great weight to Dr. Bahhady's opinion because he was a treating physician.

The ALJ also gave great weight to Dr. Kushner's March 2014 opinion that Claimant's narcolepsy medication needed to be adjusted. Claimant asserts that Dr. Kushner did not address the fact that her medication was adjusted at that time, nor did his assessment account for continued narcoleptic symptoms that occurred after the evaluation was completed.[12] It is unclear why the medication adjustment would be significant. Although her narcoleptic symptoms continued after the adjustment of medication, Dr. Kushner did not opine that adjustment in her medication would eliminate all symptoms.

Finally, the ALJ gave great weight to Dr. Quraini's opinion that Claimant was doing well with no new complaints. Claimant argues this is not relevant to her narcolepsy, because Dr. Quraini is a cardiologist and did not treat Claimant for narcolepsy. The Court finds merit in Claimant's argument that the ALJ erred in giving great weight to Dr. Quraini's opinion.

---

[12] The ALJ also gave Dr. Kushner's opinion that Claimant was capable of working at a medium level great weight, which Claimant does not challenge.

Claimant cites Rodriguez v. Astrue, 694 F. Supp. 2d 36, 46 (D. Mass. 2010), in which "the ALJ also took out of context statements of yet other medical professionals," for example, by relying on a statement that "Plaintiff was fully oriented within the context of a *physical*, not a psychological exam which did not explore problems such as anxiety or panic attacks." In addition, a "'particularly noteworthy' comment that Plaintiff's mood was 'stable' . . . was made by a non-mental health physician who had merely commented that Plaintiff stated her moods are stable." Id. In Rodriguez, however, the Court found that the ALJ discounted a treating physician's opinion and the corroborating medical records in favor of elevating the opinion of a doctor who did not treat plaintiff's mental health, thus replacing sound medical opinions with his own personal assessment, which was an obvious error that entitled plaintiff to relief. Id. at 46–47. The ALJ in Rodriguez had "virtually ignored" the opinions of several experts, placing greater weight on the opinion of a specialist who did not specialize in the area for which he offered his opinion. Id. at 46.[13]

---

[13] Claimant quotes Rose v. Shalala, 34 F.3d 13, 18 (1st Cir. 1994) for the proposition that, once the evidence established that the claimant had chronic fatigue syndrome ("CFS"), the Commissioner "had no choice but to conclude that the claimant suffers from the symptoms usually associated with CFS." Rose is distinguishable in several ways. First, in Rose, the ALJ ignored evidence that the claimant had CFS and its associated symptoms, whereas here, the ALJ concluded that Claimant suffered from narcolepsy. See Lopes v. Barnhart, 372 F. Supp. 2d 185, 195 (D. Mass. 2005) ("Here, in contrast [to Rose], the hearing officer concluded that [claimant] has a history of Lyme disease and fibromyalgia, but found that the level of incapacity asserted was inconsistent with the record as a whole."). Furthermore, the ALJ in Rose relied only on the opinions of non-treating physicians, unlike here. See Jette v. Astrue, No. CIV.A. 07-437A, 2008 WL 4568100, at *12 (D.R.I. Oct. 14, 2008) ("Thus, unlike the situation in Rose, the ALJ in this case relied on more than just the reports of non-examining physicians in his decision."). Moreover, the logic of Rose appears to rely, in part, on the unique difficulty inherent in diagnosing CFS. See Rose, 34 F.3d at 18 ("Because chronic fatigue syndrome is diagnosed partially through a process of elimination, an extended medical history of 'nothing-wrong' diagnoses is not unusual for a patient who is ultimately found to be suffering from the disease." (internal quotation marks omitted)). Finally, taking this sentence in Rose to mean that, once a disease is diagnosed, it is presumed to be severe unless proven otherwise, would flip the burden of proof at step three, as discussed infra, in contravention of well-established law.

Here, the ALJ did not discount or ignore sound medical opinions in favor of Dr. Quraini's opinion. Even assuming that the ALJ erred in affording weight to Dr. Quraini's opinion, any error is harmless because there is still substantial evidence supporting the RFC determination and ultimate disability determination, including the opinions of Dr. Bahhady, PA-C Mastria, and Dr. Kushner. Thus, although the ALJ should not have afforded great weight to Dr. Quraini's opinion in relation to Claimant's narcolepsy, this was harmless error, and the Court affirms the ALJ's determination.

### C.    Narcolepsy Determination

Claimant also argues that because the ALJ found she had a severe impairment of narcolepsy at step two, the Commissioner "had no choice but to conclude that [she] suffers from the symptoms associated with [narcolepsy], unless there was substantial evidence in the record [sic] to support a finding that [she] did not endure a particular symptom or symptoms." [ECF No. 22 at 11]. While Claimant's argument is not entirely clear, the Court interprets this section of Claimant's brief as asserting that, because the ALJ determined, at step two, that Claimant suffered from narcolepsy, the ALJ was required to find at step three that her symptoms were severe enough to render her disabled, unless the ALJ was able to cite evidence demonstrating that her symptoms were not severe. This argument misstates the burden of proof. "At step three, 'it is the claimant's burden to show that [she] has an impairment or impairments which meets or equals a listed impairment . . . ." Arrington v. Colvin, 216 F. Supp. 3d 217, 233 (D. Mass. 2016), aff'd sub nom. Arrington v. Berryhill, No. 17-1047, 2018 WL 818044 (1st Cir. Feb. 5, 2018) (quoting Torres v. Sec'y of Health & Human Servs., 870 F.2d 742, 745 (1st Cir. 1989)).

The ALJ's decision demonstrates that he considered the available evidence and reached the conclusion that Claimant failed to show that her symptoms such as fatigue, lack of alertness,

and concentration problems were so severe that they prohibited her from working. "It is not enough for [claimant] to be diagnosed with" an impairment; the claimant "must provide evidence that [his or her impairment] "significantly limit[s] [his or her] physical or mental ability to do basic work activities.'" Grady v. Astrue, 894 F. Supp. 2d 131, 141 (D. Mass. 2012) (quoting 20 C.F.R. § 404.1520(c)). "A mere diagnosis of a condition 'says nothing about the severity of the condition.'" White v. Astrue, No. CIV.A. 10-10021-PBS, 2011 WL 736805, at *6 (D. Mass. Feb. 23, 2011) (quoting Higgs v. Bowen, 880 F.2d 860, 863 (6th Cir. 1988)); see also Huertas v. Astrue, 844 F. Supp. 2d 197, 204–05 (D. Mass. 2012) (holding claimant did not meet burden of demonstrating further limitation from her impairment where there was little evidence in the record to indicate any specific limitations beyond the diagnosis); Curtis v. Astrue, No. 4:07–cv–0148, 2008 WL 4822548, at *6 (S.D. Ind. Nov. 3, 2008) (noting that not all narcoleptics are incapable of holding jobs, given that a diagnosis does not amount to a showing of total disability).

Here, Claimant cited no medical records or objective test results to demonstrate that her narcolepsy precluded her from working. None of Claimant's treating physicians, or the state-agency consultants, indicated that she could not work due to her narcolepsy, or indicated that she had certain symptoms or required particular accommodations that would interfere with her ability to find work. Claimant did offer her own testimony concerning limitations due to narcolepsy, but for the reasons discussed supra, the ALJ permissibly discredited her testimony on that matter.

Claimant also cites to the SSA's Program Operations Manual System (POMS) listing for narcolepsy, and argues that her symptoms are consistent with the Narcolepsy POMS listing. There is no dispute that she was suffering from narcolepsy, however. Rather, the issue is whether

her symptoms rose to the level of severity needed to satisfy the conditions for a listed impairment. Narcolepsy is not actually a listed impairment, and the POMS listing for narcolepsy states that "when evaluating medical severity, the closest listing to equate narcolepsy with is Listing 11.02, Epilepsy." Social Security Administration, Evaluation of Narcolepsy, POMS DI 24580.005, *available at* https://secure.ssa.gov/poms.nsf/lnx/0424580005. "It is unclear how a [claimant] with narcolepsy would medically equal the epilepsy listing," because the POMS states that "'narcolepsy and epilepsy are not truly comparable illnesses,'" and it "gives precious little guidance on how to evaluate whether narcolepsy is severe." Salisbury v. Berryhill, No. 1:16-CV-531-DBH, 2017 WL 4322391, at *1 (D. Me. Sept. 28, 2017) (quoting POMS DI 24580.005). That said, it is clear that a mere diagnosis of narcolepsy is not sufficient to demonstrate that the illness is severe, and Claimant has not argued that she satisfied any criteria for severity that would correspond to Listing 11.02. Furthermore, the ALJ's decision that her impairment was not severe is supported by substantial evidence, as discussed supra. Therefore, the ALJ did not err at step three.[14]

## IV.    CONCLUSION

For the reasons stated herein, the Court finds that the ALJ's decision was supported by substantial evidence and therefore DENIES Claimant's motion to reverse and remand [ECF No. 21] and ALLOWS the Commissioner's motion to affirm [ECF No. 27].

---

[14] Claimant argues that the appropriate relief is an award of benefits. Since the ALJ's decision was supported by substantial evidence, for the reasons discussed supra, Claimant is not entitled to an award of benefits. Moreover, this is not the type of unusual case that would warrant such an order. See Seavey v. Barnhart, 276 F. 3d 1, 11 (1st Cir. 2001) ("[O]rdinarily the court can order the agency to provide the relief it denied only in the unusual case in which the underlying facts and law are such that the agency has no discretion to act in any manner other than to award or to deny benefits.").

**SO ORDERED.**

March 22, 2018                                              /s/ Allison D. Burroughs
                                                            ALLISON D. BURROUGHS
                                                            U.S. DISTRICT JUDGE